# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 3, 2022

Lyle W. Cayce
Clerk

No. 20-40427

James George,

*Plaintiff—Appellant*,

*versus*

SI Group, Incorporated, *doing business as* Schenectady International, Incorporated; Evergreen Tank Solutions, Incorporated; Bulk Tank International; Brenner Tank Services, L.L.C.; Walker Group Holdings, L.L.C.; Bulk Solutions, L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:16-CV-360

Before Jolly, Haynes, and Oldham, *Circuit Judges*.

E. Grady Jolly, *Circuit Judge*:

James George suffered severe burns when one "leg" of the landing gear on a tanker-trailer, detached from its tractor and sank into a gravel surface, causing the tanker-trailer, filled with scalding water, to tip over and to spill its contents on him. George brought a premises-defect claim against the owner of the property. He also asserted products-liability claims against the owner of the tanker-trailer and three companies involved in designing,

distributing, or manufacturing the tanker-trailer. The district court dismissed his products-liability claims on the pleadings and his premises-defect claim on summary judgment. George has appealed. Because the district court did not apply the proper standard for evaluating the plausibility of George's pleadings under Federal Rule of Civil Procedure 12(b)(6), and because the district court erroneously concluded that Chapter 95 of the Texas Civil Practice & Remedies Code governed George's premises-defect claim, we AFFIRM IN PART and REVERSE IN PART its dismissal orders, VACATE its judgment, and REMAND for further proceedings not inconsistent with this opinion.

**I**

The district court, as noted, dismissed George's products-liability claims on the pleadings and his premises-defect claim on summary judgment. Because the dismissals occurred at different stages, we examine the facts separately as they relate to the products-liability and premises-defect claims.

**A**

Regarding the products-liability claims, we accept as true the well-pleaded factual allegations in George's operative complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679–81 (2009).

According to the complaint, James George was working for Veolia Environmental Services on August 15, 2016, at SI Group's Freeport, Texas facility. SI Group had hired Veolia to provide pressure washing and cleaning services. George and the other Veolia contractors used tanker-trailers equipped with coils capable of heating water to 200°F.

SI Group provided the tanker-trailers that the Veolia crew needed to complete the job. Evergreen Tank Solutions owned the tanker-trailers and leased them to SI Group. Bulk Tank International, Bulk Solutions, and

Brenner Tank Services "were involved with the manufacture, marketing, and distribution" of the tanker-trailers. More specifically, Bulk Tank International, a Mexican corporation that had been served but had not answered or appeared, manufactured the tanker-trailers. Bulk Solutions served as one of Bulk Tank International's United States-based distributors. And Brenner Tank Services "participated in the design" of the tanker-trailers. Additionally, "Bulk Tank, Bulk Solutions, and Brenner Tank . . . designed, tested, assembled, manufactured, marketed, distributed, and/or sold the tanker trailer that injured Plaintiff."

SI Group directed the Veolia crew to park the tanker-trailer and a vacuum truck on unpaved gravel at the end of a long alleyway. (The tanker-trailer and vacuum truck had to be parked close to the site of the pressure washing.) The crew then backed the vacuum truck and tanker-trailer down the alleyway, parking them both on the gravel.

George was sitting in the cab of the vacuum truck. He "heard a screeching noise and turned to see the tanker[-]trailer tipping over towards" him. As the tanker-trailer tipped over, the manway opened, pouring 200° F water into the cab of the truck and onto George, who suffered second- and third-degree burns.

According to George's complaint, the tanker-trailer suffered from a marketing defect. As the companies that had "designed, tested, assembled, manufactured, marketed, distributed, and/or sold the tanker trailer that injured [George]," Bulk Tank International, Bulk Solutions, and Brenner Tank should have warned users against detaching the trailer "unless there [was] a concrete slab (or other level foundation) to support the feet of the trailer." Those warnings should have appeared "on the front, back, sides, and specifically in the areas where users of the trailer would work when detaching the trailer from the tractor (at or around the feet of the trailer)."

3

Without those warnings, "it [was] reasonably foreseeable that users w[ould] park the trailers (both full or empty) on dirt, gravel, or other unpaved surfaces."

The tanker-trailer was also defectively designed, according to the complaint. First, each "foot" or "pad" of the landing gear "should have been designed with a greater surface area that better distributed the load weight and made the trailer more stable." This design was "feasible to accomplish," "would not have made the trailer materially more expensive to design," and "would also not [have] affected the utility of the landing gear pads to work properly." Second, the legs of the landing gear "should also have been designed to be wider, or stated differently, further apart from one another." Bulk Tank International, Bulk Solutions, and Brenner Tank "had the ability to create wider landing gear, and doing so would not have made the trailer materially more expensive."

Evergreen Tank Solutions also bore some responsibility for George's burns, according to the complaint. "As the owner of the trailer," Evergreen Tank Solutions "should have warned SI Group of the hazards associated with parking the trailer while full on unpaved or unstable surfaces." But it did not do so. Had it so warned, "SI Group could have directed the Veolia crew to park the trailer on a stable or paved surface, which would have avoided this incident."

B

Regarding the premises-defect claims, we take the relevant facts from the summary judgment record, construed in favor of the nonmovant, George. *See Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).

SI Group is a chemical manufacturer that owns a plant in Freeport, Texas, where it stores chemicals in tanks. Occasionally, SI Group needs to change the chemicals stored inside a particular tank. But the "new" chemical

is not introduced until the "old" chemical is fully removed. To remove the residue of the outgoing chemical, SI Group hires a contractor to conduct a "hot-water wash" of the tank's interior.

In 2016, SI Group hired an industrial cleaning contractor, Veolia, to conduct a hot-water wash of its F-741 tank. The wash allows SI Group to transfer the tank to a "different product." SI Group supplied the equipment for the job, including a vacuum truck and two tanker-trailers. The tanker-trailers store the hot water used to wash the tank; each one is equipped with coils designed to heat the water to 200°F. A hose runs from the back of the tanker-trailer to a pressure-washer-like device that is used to spray the inside of the tank. The vacuum truck extracts the dirty water that builds up inside the tank during the wash.

Although a hot-water wash can span weeks, the process is straightforward. A Veolia technician washes the tank "[n]onstop," until the first tanker-trailer empties or the vacuum truck fills. When the first tanker-trailer runs out of water, a Veolia employee pulls it to the front of the plant using a tractor, unhitches it from the tractor, drops it on cement pavement, and leaves it resting on its legs. After dropping the empty tanker-trailer, a Veolia employee hitches the full tanker-trailer to the tractor. The driver then pulls the full tanker-trailer to a gravel "staging area" near the tank to continue the wash. The empty tanker-trailer is refilled with water and left to steam overnight while resting on its legs.

James George, a technician, was part of a four-man Veolia crew conducting the hot-water wash of SI Group's F-741 tank on August 15, 2016. George arrived at the plant around six or six thirty that morning. To start the day, the Veolia crew met with SI Group's permitting representative and walked the site. The representative told the Veolia crew to park the vacuum truck and tanker-trailer in a gravel area near the F-741 tank. During the

walkthrough, George saw a tanker-trailer—unhitched, filled with water, and dropped on its legs—in the same gravel area. The Veolia crew and SI Group's permitting representative did not discuss whether the tanker-trailer should be unhitched from the tractor and left resting on its legs in the gravel staging area. According to George, "it was normal procedure" for Veolia to unhitch the tanker-trailer from the tractor and to rest it on its legs. Indeed, George had washed tanks at the same facility at least twice before; both times his crew had unhitched the tanker-trailer and dropped it on its legs in the same area.

The gravel surface appeared firm. George did not notice any ruts or divots; it "looked like regular, stable ground" to him. Veolia's crew leader for the day, Michael Muñoz, similarly saw nothing that led him to believe the ground was unstable. Like George, Muñoz (on a previous job) had placed an unhitched tanker-trailer, legs down, on gravel at the same plant.

After the walkthrough, the Veolia crew started the hot-water wash of the F-741 tank. An SI Group employee checked on the Veolia crew several times during the day. The wash continued without issue until mid-afternoon, when the first tanker-trailer ran out of hot water. A Veolia employee pulled the empty tanker-trailer aside, unhitched it from the tractor, and dropped it on its legs. A Veolia employee then hitched the tractor to the full tanker-trailer and began pulling it to the gravel staging area. He pulled the full tanker-trailer beside the vacuum truck, near a fire monitor fed by pressurized underground pipes.

As Veolia employee, Joe Armstrong, backed the tanker-trailer into position, the suspension airbags of the tractor blew. Veolia's crew leader, Muñoz, told one of his supervisors about the problem. The Veolia supervisor in turn told Muñoz to unhitch the tanker-trailer from the tractor and to park the tractor on the side of the road so that a mechanic could repair the

suspension. That made sense to Muñoz, who thought it would be unsafe for the mechanic to repair the tractor's suspension while the tanker-trailer was hitched. The Veolia crew thus decided to unhitch the tanker-trailer and to allow the full tanker-trailer to rest on its legs atop the gravel. Before unhitching the tanker-trailer, though, Muñoz and Armstrong surveyed the gravel surface and concluded that it was stable enough to support the tanker-trailer's legs.

At this point, George was sitting in the front passenger-side seat of the vacuum truck, parked beside the tanker-trailer. The driver-side window was open, as was the manway atop the tanker-trailer. George then heard a "screeching sound." The tanker-trailer's right landing-gear leg sunk into the gravel near the fire monitor, causing the tanker-trailer to tip over. Hot water cascaded out of the manway into the driver-side window and onto George.

As 200°F water flooded the truck, George leaped out of the passenger-side window. He ran down the alley towards Muñoz, screaming for help and tearing off his clothes. His skin was falling off. By the time he reached Muñoz, "some parts" were "just hanging." An ambulance eventually picked him up and brought him to the hospital. From there, he was airlifted to a burn center in Galveston. He suffered second-degree burns to about 30% of his body and third-degree burns to about 10%.

At least an hour after the accident, but still during "normal business hours," Muñoz heard two SI Group employees talking about the fire monitor that was located near the gravel staging area where the tanker-trailer had tipped over. Muñoz was walking near "[o]ne of the SI guys," who said that the fire monitor has "been out of service" because of an "underground water leak." Muñoz knew that they were talking about the fire monitor near the site of the accident "[b]ecause they were standing right in front of it." Muñoz

No. 20-40427

understood them to be saying that the pipes beneath the fire monitor had been leaking *before* the accident.

Later that day, Veolia began its investigation. It ultimately "found that there was a water line leaking under the ground of where the tanker's [l]anding gear had been placed which contributed to the landing gear sinking into the ground." It also found that the tanker "should not have been staged on that ground."

SI Group also investigated. It found that "[t]he trailer tipped as a result of being set down onto un-stabilized ground." More specifically, its "root cause analysis report" identified three reasons why the tanker-trailer tipped: (1) the tractor was unhitched from the tanker-trailer; (2) the weight of the tanker-trailer, filled with water, was "concentrated on [a] small area of [the] landing gear"; and (3) the ground under the "landing gear" wasn't stable. As for the third reason, the SI Group report noted that a leaking fire monitor might have played a role:

> The ground the trailer landing gear sunk into was next to a fire monitor – fire monitors allow some water to leak into the ground during operation. This may have induced additional weakness into the un-stabilized ground.

## II

George sued in Texas state court, alleging various claims against the several defendants. SI Group removed the case to the Southern District of Texas based on diversity jurisdiction. Originally assigned to Judge George Hanks, the case was later reassigned to Judge Lynn Hughes.

Before reassignment, George twice amended his complaint. Afterwards, George sought leave to amend once more, attaching a detailed,

twenty-page complaint.[2] The district court denied leave to file *that* complaint, but it granted leave to file *another* complaint—one that was "ten or fewer pages" in length, which, the district court said, "must be fact intensive and not restate the claims and laws of products liability, design defects, and manufacturing defects." The district court gave no reasons and cited no authority for the restrictions it imposed.

In response to the order granting leave, George filed the operative, eight-page complaint. As we have noted, George alleged a premises-defect claim against SI Group and products-liability claims against Bulk Tank International, Bulk Solutions, Brenner Tank, and Evergreen Tank.

Bulk Solutions, Brenner Tank, and Evergreen Tank moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6).[3] The district court granted the motions. In holding that George had failed to plead plausible claims, however, the district court did not confine its review to the pleadings. Instead, the district court (1) relied on what a Brenner Tank representative "testified" and what an "inspection revealed" to conclude that Brenner Tank had no knowledge of any problem with the tanker-trailer; (2) cited the absence of "data" showing that the legs of the tanker-trailer were unsafe; and (3) faulted George for failing to "suppl[y] the court with any facts of an alternative design."

Later in the proceeding, the district court granted summary judgment dismissing the premises-defect claim against SI Group. The district court concluded this claim was governed by Chapter 95 of the Texas Civil Practice & Remedies Code, which meant that George had to show that SI Group had control over the way George's work was done and that it had actual

---

[2] George calls this his "second amended complaint," but it is actually his third.

[3] Bulk Tank International did not answer or otherwise respond to the complaint.

knowledge of the danger or condition causing his injury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.003. Because the district court concluded that George had no evidence of control or of actual knowledge, it dismissed the claim as barred by Chapter 95. Final judgment followed. George has timely appealed, challenging both the Rule 12(b)(6) dismissal and the summary-judgment dismissal.

On November 11, 2021, we issued a limited remand for the district court to consider whether diversity jurisdiction exists in this case. On March 29, 2022, the district court entered an opinion concluding that the parties in this case are diverse. No party has appealed the district court's jurisdictional decision. We agree with the district court; there is complete diversity of citizenship between the parties in this case. *See Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 397 (5th Cir. 2013). Now we turn to the merits.

## III

### A

We consider George's products-liability claims before turning to his premises-defect claim. We review *de novo* the Rule 12(b)(6) dismissal of George's products-liability claims. *See Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020). The principles that govern the Rule 12(b)(6) inquiry are well established; we consider three of them.

First, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Second, a Rule 12(b)(6) motion tests the sufficiency of the pleadings, not the merits of the case. *See Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020). That is why the well-pleaded factual allegations of a complaint must be taken as true and viewed in the light most favorable to the plaintiff. *See id.*

Third, "a Rule 12(b)(6) motion typically cannot rely on evidence outside the complaint." *C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank*, 838 F.3d 655, 660 (5th Cir. 2016). True, a district court may rely on evidence outside the complaint, without converting the Rule 12(b)(6) motion into a motion for summary judgment, if that evidence is either (a) a document attached to the Rule 12(b)(6) motion, referred to in the complaint, and central to the plaintiff's claim; or (b) a matter subject to judicial notice under Federal Rule of Evidence 201.[4] *See Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). But going beyond the pleadings is otherwise error. *See Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

The district court misapplied these principles, requiring us to reverse the Rule 12(b)(6) dismissal as to Brenner Tank and Bulk Solutions and to remand for a proper analysis.

We first observe that, notwithstanding it was addressing a Rule 12(b)(6) motion, the district court went beyond the pleadings. For example,

---

[4] If "matters outside the pleadings are presented to and not excluded by" the district court on a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There is no indication in this record that the district court intended to convert the Rule 12(b)(6) motions into motions for summary judgment in compliance with the procedure outlined in Rule 12(d). If the district court did intend a conversion, however, it did not give George a reasonable opportunity to present all pertinent material, as Rule 12(d) requires.

the district court relied on what "Brenner [Tank] testified" and an "inspection [that] revealed no evidence" to conclude that George had failed to plead plausible claims. It further pointed to the absence of "data" to support the allegation that the tanker-trailer's legs were unsafe. And it observed that, in its view, "George's speculations about the designer, manufacturer, and distributor are the only evidence of a defect in the trailer." These statements suggest that the district court put George to his proof. The existence *vel non* of proof that the tanker-trailer was defective, however, is a merits inquiry for summary judgment and, if necessary, for trial—not for the Rule 12(b)(6) stage. *See Sewell*, 974 F.3d at 582. It was inappropriate for the district court to require data, to rely on testimony, and to cite the failure to produce evidence at this Rule 12(b)(6) stage. *See Brand Coupon Network, L.L.C.*, 748 F.3d at 635.

Still further, some of the claims the district court dismissed were not the claims George had pleaded. For example, the district court concluded that George failed to plead a marketing-defect claim against Bulk Solutions and Brenner Tank because Bulk Solutions and Brenner Tank could not have "warned of the possibility of an underground water leak." But that is not the claim George pleaded: George alleged that Bulk Solutions and Brenner Tank failed to warn that the tanker-trailer should not be unhitched from the tractor unless the tanker-trailer's legs can rest on a level foundation. This marketing-defect claim was not grounded on the failure to warn of an underground water leak, obviously unforeseeable to the designer, distributor, or manufacturer of the tanker-trailer. Yet the district court recast the claim as if it were. And the district court made the same error with respect to an unpleaded "negligence" claim against Brenner Tank.

These errors require that we reverse the district court's dismissal of George's products-liability claims against Brenner Tank and Bulk Solutions and remand for the district court to conduct a proper Rule 12(b)(6) inquiry.

B

We now turn to the district court's dismissal of Evergreen and conclude that the district court properly dismissed Evergreen from the case.

We may affirm a Rule 12(b)(6) dismissal on any record-supported basis. *See Taylor v. City of Shreveport*, 798 F.3d 276, 288 n.60 (5th Cir. 2015). Chapter 82 of the Texas Civil Practice & Remedies Code generally immunizes a nonmanufacturing seller from products-liability claims unless the claimant proves that a statutory exemption applies. Tex. Civ. Prac. & Rem. Code Ann. § 82.003(a). The complaint does not allege that Evergreen manufactured the tanker-trailer; it only states that Evergreen "owned" and "leased" the tanker-trailer at issue, making Evergreen a nonmanufacturing seller as defined by Chapter 82. *Id.* § 82.001(3) (defining "seller" as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof"). Thus, Evergreen is immune from George's products-liability claim unless George pleaded facts establishing Evergreen's liability as a "nonmanufacturing seller" under subchapter 82.003.[5]

George argues that he pleaded sufficient facts to invoke the seventh exception listed in subchapter 82.003(a)(7)(B), which allows a claimant to recover against a nonmanufacturing seller when "the manufacturer of the product" is "not subject to the jurisdiction of the court." *Id.* § 82.003(a)(7)(B). Subchapter 82.003(c) creates a conclusive presumption that the manufacturer is not subject to the jurisdiction of the court for the

---

[5] Subchapter 82.003 is not an affirmative defense. It is a cause of action under the substantive law of products liability in Texas. *See Allen v. Walmart Stores, L.L.C.*, 907 F.3d 170, 182 (5th Cir. 2018) (holding that plaintiff's failure to plead specific facts was fatal to his claim under subchapter 82.003(6)).

purposes of Subchapter (a)(7)(B) "[i]f after service on a nonresident manufacturer through the secretary of state in the manner prescribed by Subchapter C, Chapter 17, the manufacturer fails to answer or otherwise make an appearance in the time required by law." *Id.* § 82.003(c). George asserts that because the complaint pleads that Bulk Tank International was the manufacturer of the tanker-trailer, and that Bulk Tank International failed to appear after being properly served, we are to conclusively presume that it was not subject to the jurisdiction of the district court and thus the exception listed in subchapter 82.003(7)(B) applies.

This argument, however, fails to acknowledge that Bulk Tank International was not the only "manufacturer" of the tanker-trailer named in the complaint as defined by subchapter 82.001. Subchapter 82.001(4) defines "manufacturer" as "a person who is a designer, formulator, constructor, rebuilder, fabricator, producer, compounder, processor, or assembler of any product or any component part thereof and who places the product or any component part thereof in the stream of commerce." Because the complaint states that "Bulk Tank, Bulk Solutions, and Brenner Tank . . . designed, tested, assembled, manufactured, marketed, distributed, and/or sold the tanker trailer that injured Plaintiff," and that Brenner Tank "participated in the design of the trailer," Bulk Solutions and Brenner Tank are both "manufacturer[s]" as defined by Chapter 82 and have appeared in this case. *Id.* § 82.001(4). Accordingly, the seventh exception listed in subchapter 82.003(7)(B) is inapplicable and Evergreen is immune from George's products-liability claims pursuant to Chapter 82 of the Texas Civil Practice & Remedies Code. *Id.* § 82.003. On this basis we affirm the dismissal of the complaint against Evergreen.

No. 20-40427

## C

We now proceed to review *de novo* the summary judgment dismissing George's premises-defect claim against SI Group. *See Morrow*, 917 F.3d at 874. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id*. We view the facts in the light most favorable to George and draw all reasonable inferences in his favor. *See Morrow*, 917 F.3d at 874.

The district court's summary-judgment ruling rested on its legal conclusion that George's premises-defect claim had to satisfy Chapter 95 of the Texas Civil Practice & Remedies Code. That conclusion was incorrect.

As relevant here, Chapter 95 makes it more difficult for the employee of an independent contractor to recover against a property owner for certain on-the-premises injuries. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.002, 95.003. Under Texas common law, the injured employee must show that the property owner "knew or reasonably should have known" about an unreasonably dangerous condition yet failed adequately to warn of the condition or to make the condition reasonably safe. *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 782 (Tex. 2021), *reh'g denied* (June 11, 2021). Under Chapter 95, by contrast, the plaintiff must show that the property owner had actual knowledge of the condition resulting in the injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003. Chapter 95 is limited in scope, however. It applies only to a claim

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a

15

contractor, or a subcontractor or an employee of a contractor or subcontractor; and

(2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor *constructs, repairs, renovates, or modifies* the improvement.

Tex. Civ. Prac. & Rem. Code Ann. § 95.002 (emphasis added).

So for Chapter 95 to apply here, George must have been "construct[ing]," "repair[ing]," "renovat[ing]," or "modif[ying]" the F-741 tank he washing. *See id.*[6] Unfortunately, Chapter 95 does not define any of these terms, and the Supreme Court of Texas has not provided guidance. Accordingly, we must interpret the terms using the methods of statutory interpretation used by the Supreme Court of Texas. *See Marlow, L.L.C. v. BellSouth Telecomms., Inc.*, 686 F.3d 303, 307 (5th Cir. 2012). That court's "goal is to ascertain legislative intent by examining the statute's plain language." *City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex. 2009). Plain meaning controls "unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results." *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010).

Applying these principles, we hold that George was not "construct[ing]," "repair[ing]," "renovat[ing]," or "modif[ying]" the F-

---

[6] SI Group argues that the F-741 tank constitutes "the improvement" under Chapter 95 and that the unstabilized gravel surface constitutes a "condition" of that improvement under Chapter 95 and *Los Compadres Pescadores*, 622 S.W.3d 785–86. George disagrees. For purposes of this opinion, we will assume, without deciding, that SI Group is correct on both counts. Still, SI Group cannot prevail on its Chapter 95 argument, because George was not "construct[ing]," "repair[ing]," "renovat[ing]," or "modif[ying]" the F-741 tank. Tex. Civ. Prac. & Rem. Code Ann. § 95.002.

741 tank he was washing. TEX. CIV. PRAC. & REM. CODE ANN. § 95.002. George was simply spraying its interior with hot water. According to one of SI Group's own technicians, the hot-water wash did not involve "changing the form of the tank" in any way—just "get[ing] it cleaned." No ordinary speaker of English, applying the plain meanings of these statutory terms, would reasonably conclude that spraying the interior of a tank with hot water constitutes "construc[tion]," "repair[]," "renovat[ion]," or "modifi[cation]" of the tank itself. *Id*. Because George was not engaged in any of the activities outlined in the statute, Chapter 95 does not apply. Thus, the district court erred in requiring George to show control and actual knowledge.

Accordingly, we reverse the dismissal of George's premises-defect claim and remand this case to the district court with the instruction to analyze the premises-defect claim under the common-law standard. That standard requires the district court to ask whether George presented summary-judgment evidence, viewed in his favor, showing that SI Group "exercised some control over the relevant work and either knew or reasonably should have known of the risk or danger." *Ineos USA, L.L.C. v. Elmgren*, 505 S.W.3d 555, 561 (Tex. 2016), *reh'g denied* (Dec. 16, 2016).

In reevaluating summary judgment, the district court will be called on to analyze the admissibility of George's evidence that the pipes beneath the fire monitor were leaking before the accident. The admissibility of that evidence will inform the district court's ultimate determination of whether George has presented evidence, viewed in his favor, establishing a genuine dispute as to each element of his common-law premises-defect claim. The district court's analysis will consider whether Michael Muñoz's testimony that he heard "[o]ne of the SI Guys" say that the fire monitor has "been out of service" because of an "underground water leak" qualifies as a party-opponent statement under Federal Rule of Evidence 801(d)(2)(D). We

17

express no opinion on that question here; we will note, however, that the statement of an unidentified declarant is admissible if "enough evidence [is] presented to support a conclusion by the district court that [the] certain unidentified person was in fact the agent of [the employer] so that any admissions made by that person constitute[] the admission[] of [the employer] for purposes of Rule 801(d)(2)(D)." *Davis v. Mobil Oil Expl. & Producing Se., Inc.*, 864 F.2d 1171, 1174 (5th Cir. 1989).[7]

---

[7] The dissent argues that we should not remand this question, but decide now that the testimony of Muñoz regarding an SI Group employee's statement is inadmissible hearsay. The district court, however, never ruled on this question—a question that is close enough to merit the district court's careful attention to its admissibility. After all, we are a court of review, not of first view. *Montano v. Texas*, 867 F.3d 540, 546–47 (5th Cir. 2017) (remanding matter not addressed by the district court for examination in the first instance). The record shows that Muñoz testified that (1) an employee of SI Group, (2) near the time of the accident, (3) during "normal business hours," (4) said that the fire monitor has "been out of service" because of an "underground water leak," (5) while "standing right in front" of the fire monitor near the site of the accident, and (6) Muñoz understood them to be saying that the pipes beneath the fire monitor had been leaking *before* the accident. Additionally, the credibility of Muñoz's testimony is somewhat bolstered by SI Group's own investigation report, which noted that: "[t]he ground the trailer landing gear sunk into was next to a fire monitor – fire monitors allow some water to leak into the ground during operation. This may have induced additional weakness into the un-stabilized ground." The primary reason that we don't allow hearsay is because the statement is unreliable, but reliability militates in favor of overcoming that objection to hearsay. *See generally* FED. R. EVID. 803 advisory committee's notes to 1972 proposed rules ("The present rule proceeds upon the theory that under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at the trial even though he may be available."). The circumstances and the record before us suggest the statement's reliability. Thus, there is enough evidence to have the district court hear the evidence for itself and rule in the first instance.

The dissent also argues that even if the statements by the SI Group employee were admissible, the statements would not create a genuine issue of material facts regarding whether SI Group knew or reasonably should have known about the risk posed by the underground leak. If, however, the testimony regarding the SI Group employee's statements is admissible, a jury may reasonably conclude, based on the facts discussed above, that, with respect to the premises defect claim, the SI Group employee knew that the fire monitor was out of service prior to the accident because of an underground water

No. 20-40427

## IV

We now sum up what we have held.

First, we have held that the district court misapplied the standards for evaluating the plausibility of George's pleadings under Rule 12(b)(6) by requiring data, by considering testimony, and by noting the failure to produce evidence. For these reasons, we reverse its judgment dismissing George's products-liability claims against Bulk Solutions and Brenner Tank, and remand these claims for reevaluation under the proper standard for resolving a Rule 12(b)(6) motion. Thus, Bulk Solutions and Brenner Tank remain as defendants.

Second, we have held that Evergreen was properly dismissed from the case. Based on the facts alleged in the complaint, Evergreen is only a nonmanufacturing seller, not a manufacturer. Bulk Solutions and Brenner Tank are both "manufacturer[s]" as defined by Chapter 82 of the Texas Civil Practice & Remedies Code and they have appeared in this case. TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(4). Accordingly, the exception listed in subchapter 82.003(a)(7)(B), the only basis to include Evergreen as a defendant, is inapplicable, and Evergreen is thus immune from George's product-liability claims. We therefore affirm the district court's dismissal of Evergreen from this suit.

Third, we have held that the district court erroneously dismissed SI Group as exempt from George's premises defect claim. Because George was

---

leak. Under Texas law, this knowledge of the existence of an underground leak prior to the accident would be imputed to SI Group. *La Sara Grain Co. v. First Nat. Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984) ("[A] corporation, is bound by the knowledge of one of its agents if that knowledge came to him in the course of the agent's employment."); *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 787 (Tex. 2021), *reh'g denied* (June 11, 2021).

No. 20-40427

not "construct[ing]," "repair[ing]," "renovat[ing]," or "modif[ying]" the F-741 tank, Tex. Civ. Prac. & Rem. Code Ann. § 95.002, Chapter 95 does not apply. We therefore reverse the order granting summary judgment and remand this claim to the district court with instructions to analyze George's premises-defect claim under Texas common law, which will require the district court to determine the admissibility of George's evidence that pipes beneath the fire monitor were leaking before the accident.

In short, on remand, the district court must: (1) conduct a proper Rule 12(b)(6) inquiry as to George's products-liability claims against Bulk Solutions and Brenner Tank, (2) reevaluate summary judgment by analyzing George's premises-defect claim under Texas common law, and (3) determine the admissibility of George's evidence that pipes beneath the fire monitor were leaking before the accident, and in the light of these rulings, proceed accordingly.

AFFIRMED IN PART, REVERSED IN PART, VACATED, AND REMANDED.

Haynes, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

As we all know, review of the grant of motions to dismiss and motions for summary judgment are de novo. *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 477 (5th Cir. 2002). Thus, statements by the district court that are incorrect either factually or legally are not the basis of review: the basis is whether the motion was properly granted. Even assuming that the district court made some erroneous statements, we "may affirm a judgment upon any basis supported by the record." *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998). De novo review mandates affirmance of the district court's grant of summary judgment to SI Group. Accordingly, I respectfully dissent in part.[1]

The district court's grant of summary judgment on George's premises liability claim against SI Group should be affirmed. As a preliminary point, I question the majority opinion's conclusion that Chapter 95 does not apply here. But even assuming arguendo that Chapter 95 does not apply, SI Group still was entitled to summary judgment under the common law theory.

George's theory is that SI Group should have warned him or his coworkers that the ground at the back of the alley was unstable due to an underground water leak. Although the underground leak was central to his claim, at summary judgment, the only evidence George offered to establish its existence was the deposition testimony of Michael Muñoz, George's supervisor.[2] Muñoz testified that, at least an hour after the accident, he

---

[1] I concur in the judgment regarding George's claims against Bulk Solutions and Brenner Tank Services. I also concur in the affirmance as to Evergreen.

[2] George claims that various investigative reports also supported the existence of the underground leak. But Muñoz was apparently the sole source of this information for these reports. Hence, George's claim rises and falls with Muñoz's testimony.

overheard two unidentified SI Group "operators" saying that the fire monitor between the tanker-trailer and the vacuum truck was out of service due to an underground water leak. Although Muñoz understood the "operators" to mean that the monitor was leaking prior to the accident, he admitted that the "operators" had not made any specific statements as to when the leak occurred.

Muñoz's testimony was insufficient to permit George's premises liability claim to survive summary judgment for two reasons. First, the "operators'" statements to Muñoz were inadmissible hearsay. *See* FED. R. EVID. 801(c), 802; FED. R. CIV. P. 56(c)(2) (mandating that a party cannot create a genuine dispute of material fact based on material that "cannot be presented in a form that would be admissible in evidence"). George asserts that the alleged "operators'" statements were excluded from the definition of hearsay under Rule 801(d)(2)(D) as statements of an opposing party's employee, but he fails to explain who these people actually were (i.e., names and identities) and, even if they were "operators," how the "operators" were acting within the scope of their duties when they were discussing the alleged leak. *Warren v. Fed. Nat'l Mortgage Ass'n*, 932 F.3d 378, 388 (5th Cir. 2019). George also contends that the statements were covered by the present sense impression and excited utterance exceptions, but the record fails to support close temporal proximity between when the "operators" perceived the leak and when they discussed it; nothing shows that the "operators" were in any way excited or stressed by the discovery of the leak. *See United States v. Polidore*, 690 F.3d 705, 720 (5th Cir. 2012) (explaining the present sense impression exception "relies on the contemporaneousness of the event under consideration and the statement describing the event" (quotation omitted)); FED. R. EVID. 803(2) (requiring that the declarant be "under the stress of excitement" for the excited utterance exception to apply). Because this evidence is inadmissible,

No. 20-40427

George did not create a genuine dispute of material fact as to his premises liability claim.

The majority opinion holds that the circumstances of this case and the record before us compel a different result. However, it does so based upon an argument not raised by the appellant: that the unknown "operators'" statements are "reliable" and thus admissible under Federal Rule of Evidence 807, such that the district court should set aside the summary judgment and rule on the statements' admissibility in the first instance.[3] But that is improper; we should not make the appellant's arguments for him. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (acknowledging "[i]n our adversarial system of adjudication, [courts] follow the principle of party presentation").

In any event, the residual hearsay exception "is to be used only rarely, in truly exceptional cases." *United States v. Phillips*, 219 F.3d 404, 419 n.23 (5th Cir. 2000) (internal quotation marks and citation omitted). Its use is not warranted here. Contrary to the majority opinion's suggestion, the "operators'" hearsay statements are not made reliable by the circumstances outlined in Muñoz's testimony. The issue, of course, is that the hearsay declarants are unidentified. In order for a statement to have the required "sufficient guarantees of trustworthiness," FED. R. EVID. 807, the district court "must find that the declarant of the . . . statement was particularly

---

[3] The majority opinion holds that remand is proper because "we are a court of review, not of first view." Majority Op. at 19 n.7 (citing *Montano v. Texas*, 867 F.3d 540, 546–47 (5th Cir. 2017)). But because we may affirm on any basis supported by the record, we need not remand every issue not decided by the district court in the first instance. *See Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 434–35 (5th Cir. 2022) (affirming summary judgment on hostile work environment claim on grounds not reached by the district court); *Boltex Mfg. Co. v. Galperti, Inc.*, 827 F. App'x 401, 408 n.5 (5th Cir. 2020) (per curiam) (evaluating evidence not considered by the district court and concluding that it was inadmissible hearsay). That is especially true where, as here, remand would be futile because the relevant statements are clearly inadmissible.

likely to be telling the truth when the statement was made," *Phillips*, 219 F.3d at 419 n.23.[4]  That cannot be done here, so there is nothing to refer back to the district court.    The "operators'" hearsay testimony is clearly inadmissible.[5]

Additionally, that "evidence" does not show that that SI Group was aware of the alleged leak prior to the accident, nor does George explain with any specificity what reasonable steps SI Group should have taken to detect it. Indeed, there is no concrete evidence that the leak even existed prior to the accident—Muñoz's understanding of the "operators'" meaning is nothing more than baseless speculation.  Furthermore, the "operators'" alleged knowledge of the leak cannot be imputed to SI Group because, as discussed above, without their identities, George is unable to establish that the "operators" were agents acting "within the scope of [their] employment." *See Warren*, 932 F.3d at 388.  Consequently, George's evidence on this critical point is utterly deficient.  Given the absence of any evidence supporting George's claim as to SI Group, the district court's grant of summary judgment should be affirmed.

Accordingly, there is no point in permitting George's claims against SI Group to progress further, costing them more for no reason; he does not

---

[4] Indeed, a hearsay statement is only admissible under Rule 807 "if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance *and the declarant's name*—so that the party has a fair opportunity to meet it." FED. R. EVID. 807(b) (emphasis added).  Without the "operators'" names, SI Group would be unable to investigate their statements or contest their assertions in any meaningful way.

[5] The majority opinion also suggests that the reliability of the hearsay statements is "somewhat bolstered" by SI Group's investigative report.  It isn't.  The report merely concluded that "[t]he ground the trailer landing gear sunk into was next to a fire monitor—fire monitors allow some water to leak into the ground during operation."  This comment on fire monitors generally does not support a conclusion, as the majority opinion implies, that this fire monitor was leaking (or even operating) at the time of George's accident, or that this fire monitor had ever leaked before.

No. 20-40427

have the evidence necessary to support his claim against SI Group. This problem is insurmountable, making remand futile in that regard. We are permitted to affirm under these circumstances and should do so here. Because the majority opinion concludes differently, I respectfully dissent as to SI Group and concur with the rest of the judgment.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment in part and dissenting in part.

Our panel is unanimous on one thing: the district court erred in a host of ways. As the principal opinion explains, the district court's 12(b)(6) analysis went far beyond the pleadings. *Ante*, at 10. Its grant of summary judgment was based on an inaccurate statement of law. *Id.* at 16. And those are just two of many mistakes.

It's of course true that, no matter how error-ridden a decision might be, we "*may* affirm a judgment upon any basis supported by the record." *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998) (emphasis added). My esteemed colleagues ably employ that rule and search the record for reasons to affirm.

But we have no obligation to do that. *See, e.g.*, *Sanders-Burns v. City of Plano*, 594 F.3d 366, 383 (5th Cir. 2010) (declining to find alternative grounds for affirmance in light of problems in the proceedings below). And it often makes sense to decline because "[w]e are a court of review, not of first view." *Landry's, Inc. v. Ins. Co. of the State of Penn.*, 4 F.4th 366, 372 n.4 (5th Cir. 2021) (quotation omitted). Given our panel's only real agreement is that the district court erred, and given that my esteemed colleagues cannot agree on either the alternative grounds for affirmance or the proper extent of such an affirmance, I would not cast about this record. I'd simply vacate the judgment and remand for further proceedings.