# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 10, 2020

Lyle W. Cayce
Clerk

No. 18-31086

Jaylon Sewell,

*Plaintiff—Appellant*,

*versus*

Monroe City School Board; Brent Vidrine, Superintendent; Roosevelt Rankins, Dean; W R Berkley Corporation; Whitney Martin, Individually and as Former Principal of Neville High School, incorrectly named as Whitney Morton,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:17-cv-01466

Before Barksdale, Stewart, and Costa, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

A motion to dismiss for failure to state a claim is not meant to resolve disputed facts or test the merits of a lawsuit. It instead must show that, even in the plaintiff's best-case scenario, the complaint does not state a plausible case for relief. In this case, the district court dismissed a high school student's claims of discrimination. Mindful of our obligation to accept his complaint's factual allegations as true and assess whether those facts permit

No. 18-31086

a reasonable inference that the school board is liable, we affirm in part and reverse in part.

## I.

Because this case is only at the pleading stage, the following comes from the plaintiff's allegations.

On the first day of school at Monroe's Neville High School, Dean of Students Roosevelt Rankins asked teachers to send students with dyed hair to his office. All the students sent to Rankins's office were African American males. One was Jaylon Sewell, who wore a "two toned" blonde hairstyle. Rankins and Principal Whitney Martin did not let Sewell attend class that day because of his hair.

Monroe City School Board's dress code prohibited "hair dyed outlandish colors." Still, many students of all races, male and female, wore dyed hair to school. Students sported blonde, purple, and red colors as well as fiery-colored hair tips. Some African American female students wore multicolored weaves in their hair. Nevertheless, Neville High did not discipline anyone other than Sewell for violating the hair policy during the 2016–17 school year.

On the second day of school, Sewell's mother, Bonnie Kirk, met first with Martin and then with superintendent Brent Vidrine. Kirk told both that she believed school administrators were discriminating against Sewell because he is an African American male.

When Sewell returned to school, Rankins "ridiculed" him "every other day" by calling him a "thug" and a "fool." At one point, Rankins asked Sewell if he "was gay with 'that mess' in his head." Rankins also

No. 18-31086

discouraged other students from talking with Sewell.[1]  Sewell became "depressed" and "sad."

In November, school officials suspended Sewell.  Sewell alleges that Rankins "encouraged" a female student to "lie" and accuse him of sexual assault.  Rankins told Sewell that he "wouldn't be getting in so much trouble if his hair were not that color."  Martin soon recommended Sewell for expulsion.  When Kirk spoke to Martin about her recommendation, Martin mentioned Sewell's hair too.  School officials provided Kirk with documentation about the suspension and expulsion just two days before Sewell's expulsion hearing.  Kirk filed a complaint with the U.S. Department of Education's Office of Civil Rights.

After the hearing, the board's expulsion committee voted not to expel Sewell.  The committee's chair explained that it chose not to suspend Sewell because the timing of events was suspicious; school officials did not complete expulsion documentation until four days after the alleged assault and did not deliver the documentation to Kirk until ten days after that.

In the spring, media reports, including one in the *New York Daily News*, reported on what had happened to Sewell.  The media attention led to school officials' "ostracizing" and "ridicul[ing]" him "even more."  Sewell was "distraught and traumatized."

Kirk filed this lawsuit in November 2017; Sewell has since turned 18 and has been substituted as the plaintiff.  The amended complaint alleges claims under Title VI, Title IX, section 1983, section 1981, and the Family Educational Rights and Privacy Act (FERPA), as well as claims under Louisiana law.  It names as defendants the Monroe City School Board,

---

[1] Sewell's complaint makes conclusory allegations that Martin ridiculed him too. Because those allegations lack details, we focus on Rankins's conduct.

Superintendent Vidrine, Dean Rankins, Principal Martin, and the school board's insurer. Attached and incorporated by reference is the Department of Education report detailing its investigation of Kirk's complaint. *See Ferrer v. Chevron Corp.*, 484 F.3d 776, 778 (5th Cir. 2007) (recognizing that a complaint can incorporate exhibits by reference (citing FED. R. CIV. P. 10(c)).

The defendants responded with a motion to dismiss for failure to state a claim. The district court, adopting a recommendation of the magistrate judge, granted the motion on all claims.

## II.

A motion to dismiss for failure to state a claim concerns the "formal sufficiency of the statement of the claim for relief," not a lawsuit's merits. *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *vacated on other grounds*, 113 F.3d 1412 (5th Cir. 1997). So when reviewing such a motion, we assume that the facts the complaint alleges are true and view those facts in the light most favorable to the plaintiff. *Id.* The complaint survives if it "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this framework is one-sided, the issue "is not whether a plaintiff will ultimately prevail but whether he is entitled to offer evidence to support his claims." *Doe*, 81 F.3d at 1401. The other side will have its say later.

## III.

While there were numerous claims before the district court, this appeal concerns just a few. Sewell does not appeal the dismissal of his FERPA and Louisiana state law claims. And although his briefs mention the claims under sections 1981 and 1983, the barebones page of his opening brief devoted to those claims is not enough to prosecute an appeal. *United States*

*v. Green*, 964 F.2d 365, 371 (5th Cir. 1992). In addition, Sewell appeals the dismissal of his Title VI and IX claims only as to the Monroe City School Board. That makes sense as claims under those statutes may be brought only against the institution receiving federal funds, not employees of those institutions. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

Title VI and Title IX seek to stamp out discrimination in programs receiving federal funds and ensure that federal resources do not support discriminatory practices. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Part of the Civil Rights Act of 1964, Title VI prohibits race discrimination in all programs receiving federal funds. 42 U.S.C. § 2000d. Enacted eight years later, Title IX was modeled after Title VI and bans sex discrimination in educational programs receiving federal funds. 20 U.S.C. § 1681(a). We interpret these kindred statutes in the same fashion. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 696 (1979).

Sewell brings claims under both statutes because he thinks school officials mistreated him not just because he is African American or male, but because he is both. The district court interpreted his complaint to raise three theories of liability: intentional discrimination, harassment or hostile environment discrimination, and retaliation. Because the school board does not contest that characterization of Sewell's claims, we follow the district court's lead.

## A.

We start with intentional discrimination. This classic claim is the most straightforward: the school board, as a federal funding recipient, cannot intentionally treat students differently on the basis of race or sex. Sewell's claim is of the selective enforcement variety. *See Plummer v. Univ. of Houston*,

860 F.3d 767, 777 (5th Cir. 2017).  He says he was punished for dying his hair while female students and students of other races were not.

A threshold issue stops his claim in its tracks—it was untimely.  Title VI and Title IX are subject to state statutes of limitations for personal injury actions.  *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015); *Griffin v. Round Rock Indep. Sch. Dist.*, 82 F.3d 414, 1996 WL 166999, at *1 (5th Cir. 1996) (unpublished per curiam).  In Louisiana, the relevant prescription period is one year.  *See* La. Civ. Code Ann. art. 3492; *cf. Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 739 (5th Cir. 2017) (applying the Louisiana law to section 1983 claim).

Sewell's mother filed suit on his behalf on November 8, 2017.  So his action was timely for claims that accrued on or after November 8, 2016.  A claim accrues when the plaintiff knows or has reason to know of the injury giving rise to the claim.  *King-White*, 803 F.3d at 762.  Sewell's complaint alleges three injuries: missing class on the first day of school, suffering verbal abuse from Rankins throughout the school year, and getting suspended.  The second injury goes to his harassment claim.  The third, he says, was retaliation for complaining about school officials' discriminatory conduct.  Only the first represents the kind of discrete adverse action characteristic of an intentional discrimination claim.  Because that injury occurred on August 15, 2016, it lies outside the prescription period.  Sewell's intentional discrimination claim cannot make it out of the starting gate.

B.

By contrast, Sewell's harassment claim has some legs.  As the district court recognized, it does not trip over a statute-of-limitations problem.  That is because of the continuing violation doctrine.  Whereas an intentional discrimination claim focuses on a specific discriminatory act, a hostile environment claim arises from the "cumulative effect of individual acts,"

some of which "may not be actionable on [their] own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). That means that "the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement." *Heath*, 850 F.3d at 737 (citation omitted). If "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117.

The doctrine applies here.[2] Sewell's complaint alleges a pattern of verbal abuse beginning the first day of school and continuing at least through March 2017, when news media began covering his story. Because some acts contributing to a hostile environment allegedly took place within the prescription period, Sewell's harassment claim was timely.

In addition to the claim being timely, Sewell's claim must be plausible to get past Rule 12. Rankins harassed Sewell if his verbal abuse was based on Sewell's sex and/or race and was "so severe, pervasive, and objectively offensive" that it deprived Sewell of an educational benefit. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). The school board is liable for that harassment if it knew about the abuse and

---

[2] The continuing violations doctrine is primarily associated with Title VII harassment claims. *See Morgan*, 536 U.S. at 115–17. Titles VI and IX rely on Title VII hostile environment caselaw. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (applying Title VII caselaw to Title VI hostile environment claim); *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 180 (5th Cir. 2011) (recognizing that Title IX borrows on Title VII principles). And the continuing violations doctrine is an accrual principle of federal law that applies based on the cumulative nature of a hostile environment claim. *Heath*, 850 F.3d at 740 (applying the doctrine to such claims brought under section 1983; *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (applying the doctrine to Title IX).

was deliberately indifferent. *Gebser*, 524 U.S. at 290–91. Assuming what Sewell alleges is true, he has stated a claim.

First, it is plausible that Rankins's harassment of Sewell stemmed from a discriminatory view that African American males should not have two-toned blonde hair. Most obviously, Rankins treated Sewell differently from students who were not black males. On the first day of school, only African American male students were sent to Rankins's office. And even though white students and black female students wore a variety of dyed hairstyles, Sewell was the only student punished during the school year for violating the hair policy.[3] Rankins's verbal abuse also tied Sewell's hair to his race and sex. Rankins asked if Sewell "was gay with 'that mess' in his head," which could imply animus toward males who do not conform to stereotypical notions of masculinity. *See E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 456–60 (5th Cir. 2013) (en banc) (explaining that epithets targeting homosexuals can support inference of gender-based stereotyping). And he called Sewell a "thug," a term that could be race-neutral or racially charged, depending on context. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (recognizing that the word "boy" may not always be benign depending on "context, inflection, tone of voice, local custom, and historical usage"); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (describing use of phrase "ghetto children" as "perhaps racially inappropriate"); *Gaston v. Bd. of Educ. of City of Chi.*, 2019 WL 398688, at *6

---

[3] In concluding that this differential treatment was not discriminatory, the magistrate's report relied on the burden-shifting framework of *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973). But that is an evidentiary framework for viewing evidence at the summary judgment stage. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019). It does not apply at the pleading stage, which asks only whether the allegation of discrimination is plausible. *Id.*

(N.D. Ill. Jan. 31, 2019) (noting that a "[school principal] called another teacher a 'thug,' which of course is a racially-charged word"); *Lloyd v. Holder*, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) (listing "thug" as example of "facially non-discriminatory terms [that] can invoke racist concepts . . . already planted in the public consciousness"). At the pleading stage, Sewell is entitled to the latter characterization. In addition, the Department of Education interviewed school officials about the first-day-of-school incident and observed that "the District did not advance a legitimate, non-discriminatory reason for its different treatment of" Sewell. It concluded that the evidence established violations of Title VI and Title IX. A federal agency's finding of discrimination may not be definitive on the subject, but it certainly supports the plausibility of Sewell's claims. *See Johnson v. Halstead*, 916 F.3d 410, 418–19 (5th Cir. 2019) (recognizing that the findings of an investigative report can support the plausibility of a hostile environment claim).

Second, the harassment may well have been so severe, pervasive, and offensive that it denied Sewell an educational benefit. To satisfy this requirement, the harassment must have had a "concrete, negative effect" on Sewell's education. *Fennell*, 804 F.3d at 410 (citations omitted). According to Sewell, Rankins verbally "ridiculed" him "every other day" for much of the school year. Rankins also discouraged other students from talking to Sewell. And he tried to convince a student to concoct an allegation that Sewell sexually assaulted her. The abuse left Sewell "depressed," "sad," "isolated," "distraught," and "traumatized." On at least one occasion, he called his mother from school, crying. *Cf. id.* (explaining that plaintiff who "suffered from anxiety and required alternative study arrangements" was deprived of an educational benefit). Intense verbal abuse that comes from an authority figure—like a school administrator—and persists for most of the school year can constitute a hostile educational environment. *See Hayut v.*

*State Univ. of N.Y.*, 352 F.3d 733, 748–49 (2d Cir. 2003) (finding triable issue when student was humiliated, had difficulty concentrating, and could not sleep as a result of in-class sexual harassment from professor, even though her academic performance did not suffer); *see also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 166 (5th Cir. 2011) ("Peer harassment is less likely to support liability than is teacher-student harassment.").

Third, it is plausible that the school board knew about the harassment. The school board had knowledge if a district official with authority to address the discrimination did. *Gebser*, 524 U.S. at 290. Superintendent Vidrine fits the bill (if not others as well). After stating that Sewell "was subject to repetitive harassment, intimidation and bullying," the complaint alleges that Kirk "complained" to several school district officials, including Vidrine. It also alleges that Kirk filed a grievance with the school board. Viewing these allegations in the light most favorable to Sewell, Vidrine knew about the harassment.

Not only did Vidrine know about the harassment, but he also could have done something about it. For an official's knowledge to be imputable to a school board, he must be vested with power to supervise the harassing employee and to take action that would end the harassment. *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997). Louisiana law gives superintendents administrative authority over school personnel, including the power to hire, place, and dismiss staff, LA. STAT. ANN. § 17:81(A)(2)–(4), (6); discipline teachers, *id.* § 17:443; and direct school principals, *id.* § 17:414.1. Vidrine could have stopped Rankins by directing Martin, disciplining Rankins, or dismissing Rankins. His knowledge was thus the school board's knowledge.

Finally, the allegation is that despite knowing of the harassment, the board did little to ensure Sewell was safe. A funding recipient's response to known acts of discrimination is deliberately indifferent when it is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Deliberate indifference is a tall hurdle: if the recipient responds reasonably to a risk of harm, it will not be liable—even if harm ultimately comes to pass. *Fennell*, 804 F.3d at 410. According to Sewell's complaint, however, the board did nothing after Vidrine promised to "talk with" Rankins and Martin when Kirk complained to him on the second day of school. It offered no response to the verbal abuse that continued and intensified throughout the school year, much less a reasonable one. *See Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) (affirming Title IX verdict when defendants presented "no evidence" of remedial measures other than district officials "talking to" harassing student). Doing nothing is the classic case of indifference.

Sewell's harassment claims under Title VI and Title IX thus survive the pleading stage. Of course, the evidentiary support for these claims may be challenged at summary judgment, and if it can pass that hurdle, at trial. *Cicalese*, 924 F.3d at 766–67. For now we have only the complaint, and we assume the factual allegations in it to be true. Under that assumption, Sewell has "alleged sufficient facts to 'nudge[] [his] claims across the line from conceivable to plausible.'" *Id.* at 768 (first alteration in original) (quoting *Twombly*, 550 U.S. at 547).

C.

Sewell's retaliation claims do not fare so well.[4]  A retaliation plaintiff must show that the funding recipient or its representatives took an adverse action against him because he complained of discrimination.  *Sanches*, 647 F.3d at 170.  That typically means the funding recipient itself signed off on the adverse action.  *E.g. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171–72 (2005) (school board terminated teacher's coaching duties after he complained about unequal treatment of girls' basketball team).  But Sewell's claim is different.  He says that Rankins—not the school board—retaliated against him for complaining about the verbal abuse by trumping up the sexual assault charge that got him suspended and recommended for expulsion.  When a case does not involve the funding recipient's "official policy," Title VI and Title IX require deliberate indifference.  *Gebser*, 524 U.S. at 290; *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 695–96 (4th Cir. 2018) (recognizing claim of deliberate indifference to student-on-student retaliatory harassment).

Sewell has not pleaded deliberate indifference to Rankins's retaliatory conduct.  On the contrary, once board officials became aware of the questionable circumstances surrounding Sewell's suspension and recommended expulsion, they rejected it.  The decision was not deliberately indifferent to possible retaliation; it helped put a stop to it.  We affirm the dismissal of Sewell's retaliation claim.

---

[4] Title IX encompasses retaliation claims.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005).  So we assume without deciding that Title VI does too.  *See Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 238 (5th Cir. 2020) (unpublished per curiam).

No. 18-31086

\* \* \*

The dismissal of Sewell's harassment claims under Title VI and Title IX against Monroe City School Board is REVERSED. The district court's judgment is AFFIRMED in all other respects.