# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 9, 2023

Lyle W. Cayce
Clerk

No. 22-50158

B.W., *a minor, by next friends* M.W. *and* B.W., *formerly known herein as* Jon AISD Doe,

*Plaintiff—Appellant,*

*versus*

Austin Independent School District,

*Defendant—Appellee.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-750

Before King, Stewart, and Haynes, *Circuit Judges.*[*]

Per Curiam:[**]

B.W., a white high school student, appeals the dismissal of his complaint against AISD alleging that he was subject to race-based harassment and retaliation once he reported the harassment. For the following reasons, we AFFIRM.

---

[*] Judge Haynes concurs in the judgment only.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-50158

## I.

The events alleged below took place between Plaintiff-Appellant B.W.'s eighth- and tenth-grade years as a student in the Austin Independent School District ("AISD"), the Defendant-Appellee in this case. All of these allegations originate from B.W.'s fourth amended complaint (the "Complaint"), the operative complaint in this action.

The Complaint alleges that B.W. first experienced harassment while he was in the eighth grade at O'Henry Middle School following a field trip in October 2017 where he wore a hat emblazoned with the slogan "Make America Great Again." According to the Complaint, there was an almost immediate "attitudinal change by staff and other students from friendly and inviting to cold and hostile." In November 2017, B.W.'s parents met with the middle school's principal, Principal Malott, after a number of unspecified "incidents" in which B.W. had been treated "poorly" "to address concerns that B.W. was becoming an object of derision because of his political beliefs." Yet, although Principal Malott promised that an action plan was forthcoming, B.W. was subject to verbal attacks "on almost a daily basis . . . because of his political allegiance to President Trump." In January 2018, B.W.'s parents again met with Principal Malott to express their concerns for B.W.'s safety and the continued absence of the promised action plan; no action plan was put in place, though, after this second meeting.

The Complaint alleges that the harassment escalated throughout the Spring 2018 semester. In February 2018, B.W. experienced "backlash and push back" after he refused to participate in a student walkout protesting gun violence. As the semester progressed, B.W. was "ostracized" for being a Republican, a supporter of former president Trump, white, and Christian. He was also "harassed" for being racist, anti-feminist, and anti-gay; B.W. asserts that he does not espouse these views. For example, the Complaint

alleges that B.W. was "made fun of . . . for being a Christian" in Latin class when another student said, "Ah, Christians should understand Latin." And "[i]n band class, two students repeatedly harassed B.W. for being Caucasian by repeating the evils of the white race in American history." The Complaint also alleges that Principal Malott participated in this "stereotypical think." On one occasion, when B.W. was listening to music using his ear buds, Principal Malott "yanked one ear bud out of his ear and stated sarcastically, 'Are you listening to Dixie?'" Principal Malott then walked away laughing to herself, and other students witnessed the entire incident.

The Complaint alleges that B.W. "experienced more and more random derogatory comments" from students and teachers after Principal Malott's remarks. One teacher, Ms. Morgan, told B.W. very loudly that she was "getting concerned about how many white people there are." An aide in B.W.'s math class, Ms. Cathey, repeatedly called B.W. "Whitey" and said, "You need help Whitey?" or "Can't figure this one out Whitey?" when he raised his hand. And Mr. Borders, a teacher, "was very hostile toward B.W." for the entirety of a school field trip. On another occasion, a student pointed to the cross around B.W.'s neck and loudly stated, "I don't like that your [*sic*] forcing your religion on me." B.W. was left in tears following an incident involving his former friend and then-student council president, D.K. D.K. had created a meme of B.W. as a hooded Ku Klux Klansman, and later admitted to creating the meme because his father had told him not to be friends with anyone who was a conservative.

In May 2018, B.W. wore his "Make America Great Again" hat while receiving his diploma at his middle school graduation. Mr. Borders responded by "meanly saying" to B.W.: "Ya know, we're trying to create a safe environment here!" The Complaint alleges that there were "no apparent consequences for anyone at O'Henry . . . for the way B.W. had been

mistreated, simply because B.W. held a different political belief than other students and apparently met the harasser's stereotypical prejudices."

The Complaint alleges that the animus toward B.W. continued into his freshman year at Austin High School. At the beginning of the Fall 2018 semester, D.K. approached B.W. about the Ku Klux Klan meme he had created of B.W. during the previous school year. B.W. then filed for and received a "Stay Away Agreement" between himself and D.K. a few days later, but D.K. and his friends "continued to harass" B.W. after the Stay Away Agreement went into effect. On one occasion, D.K. approached B.W. in front of a group of students saying, "So you really said that? Gay people don't exist?"; B.W., however had never made such a statement. The Complaint alleges that "Staff" then met with D.K. and his parents regarding his treatment of B.W., but D.K.'s behavior toward B.W. did not improve after this meeting.

B.W. struggled with other members of the student body that semester as well. He was insulted and kicked for wearing a Ted Cruz shirt. In his ELA class, B.W. asked if he could write a paper on the Second Amendment; the other students in the class responded by chanting "School Shooter! School Shooter!" while the teacher, Mr. Meadows, looked on in silence. And later in the semester, another student "mockingly asked" B.W., "Why are you a racist?" That same day, the same student approached B.W. again, this time in front of other students as well, and stated that B.W. was a "[f]ucking racist." Later in the semester, B.W. was the only student to rise in his home room class for the Pledge of Allegiance when it came on over the loudspeaker; a student then told B.W., "America is only for white people."

The Complaint also describes various interactions between B.W. and his teachers during the Fall 2018 semester. On B.W.'s birthday, his MAPS teacher, Mr. Mathney, walked into class and loudly stated, "Woke up this

morning to see all the stupid things Trump had done!" During debate class, the teacher, Ms. Cooney, loudly stated, "Trump is running [*sic*] our democracy and he is a liar." A few days after Halloween, Mr. Meadows asked the ELA class if anyone had any Halloween candy. When B.W. offered some of his, Mr. Meadows responded, "Your candy would be filled with hate and oppression" in front of the entire class. And when a substitute teacher, Ms. Mauser, overheard B.W. and his friends having a conversation regarding a girlfriend during a MAPS class, she told B.W., "I will not have a white man talk to me about gender issues!"

In September 2018, B.W. and his parents filed their first grievance with the school board describing their previous complaints regarding B.W.'s treatment and the lack of any investigation into those incidents. Two months later, after the family met with school officials, the high school assistant principal, Steven Maddox, was assigned to investigate B.W.'s parents' concerns. The Complaint alleges that B.W. began to suffer from retaliation shortly after the investigation was opened. A few days after the meeting with school officials, D.K. purposefully bumped into B.W. and said, "I don't deserve what's happening to me." D.K.'s friends also approached B.W. asking, "Why he's a homophobe?" and "Why he's a racist?" In December 2018, Assistant Principal Maddox provided a written response that summarized the conclusions from his investigation. In the written response, Assistant Principal Maddox determined that there was no teacher bias and harassment. He also concluded that D.K.'s treatment of B.W. qualified as bullying according to AISD's policies and procedures. Assistant Principal Maddox then spoke with D.K. and his parents and had B.W. and D.K. sign another Stay Away Agreement.

The Spring 2019 semester was no different for B.W. The Complaint alleges that the "verbal bullying and harassment" occurred multiple times a day and included B.W. being called a racist, "cussed at," and "flicked off"

daily, often in front of teachers who never intervened. After B.W. had expressed his political opinion during a class discussion, the substitute teacher, Ms. Mosher, responded "When you are old enough to think for yourselves [*sic*], you will no longer be a conservative." She then proceeded to kick B.W. out of the class and into the cold outside. The Complaint alleges that Ms. Mosher generally "verbally harasse[d]" B.W. in front of his classmates "because of his political support for Republican Ideology."

In February 2019, B.W. was attacked while helping a fellow student with a math assignment. B.W. was using his laptop, which had stickers supporting Donald Trump on its casing. The encounter began when another student, I.L., began tracing a swastika on the back of the student that was being helped by B.W. I.L. then told B.W., "I'm going to beat the shit out of you." The next thing B.W. remembers is that he was lying on the ground bleeding after being struck multiple times. B.W. and his family reported this incident to the AISD police the next day, but the Complaint alleges that no action was taken. B.W. later discovered that I.L. had told others that I.L. had assaulted B.W. because B.W. was white; B.W. also heard that I.L.'s friends were "out to get [B.W.]" In March 2019, B.W. brought a poster of Justice Antonin Scalia to his debate class. The teacher, Ms. Cooney, was visibly irritated, yelled at B.W., and also told him, "You're pissing me off!" in front of the entire class.

The Complaint alleges that the harassment continued throughout B.W.'s sophomore year of high school as well. Like he was during the prior school year, B.W. was called a racist, "cussed at," and "flicked off" daily. D.K. and his friends also "continued to harass and intimidate B.W." I.L.'s friends did so as well and would try to trip B.W. as he would walk by. On one occasion, a student told B.W., "if you support Trump you must be stupid." In September 2019, B.W. returned to his debate classroom to retrieve his poster of Justice Scalia, but the poster was no longer there. In November

No. 22-50158

2019, B.W. was "berated" while serving as an aide in the attendance office by Ms. Lindsay when she saw a Trump/Pence sticker on his new computer. And during the Fall 2019 semester, while B.W. was in the locker room after cross country practice, "a number of African American students came in and said 'here are all the white boys!'" In March 2020, while B.W. was talking with some friends at lunch, a girl standing next to the group turned to look directly at B.W. and said very loudly, "Oh my Fucking [*sic*] God, I'm going to kill all Trump supporters, I don't give a shit who hears it. I want to kill all of them." After an investigation, the AISD police determined that they would be taking no further action because the student who had made the threat "did not have the means to kill all Trump supporters."

All AISD schools were shut down the day after the incident at lunch due to the COVID-19 outbreak. B.W. never returned to school and was homeschooled during the following 2021–22 school year. Throughout the period in question, B.W. and his family repeatedly submitted both formal and informal complaints to school administrators recounting the alleged bullying and harassment. The Complaint alleges, though, that school administrators never acted to remedy the bullying and harassment.

On July 14, 2020, B.W. filed his initial complaint, asserting claims against AISD for violations of his First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 and for negligence. In its fifth iteration that was filed on May 27, 2021, the Complaint maintains the § 1983 claims and adds claims seeking redress under Title VI of the Civil Rights Act of 1964 and Chapters 106 and 110 of the Texas Civil Practices & Remedies Code. With respect to the Title VI claims, which are at issue before us, the Complaint alleges that AISD knew that B.W. was being harassed because of his race and race-based stereotypes, yet "failed to keep him safe from harm, and failed to provide him an environment that was not hostile," *i.e.*, that AISD acted with deliberate indifference. Additionally, the Complaint alleges that B.W. was a

victim of retaliation due to his reporting of the harassment subject to Title VI. On May 28, 2021, AISD moved to dismiss the Complaint.

On January 28, 2022, the magistrate judge, who had been referred AISD's motion, issued his report and recommendations and recommended that the Complaint be dismissed in its entirety. Regarding the Title VI claims, the magistrate judge reasoned that the Complaint was devoid of facts that would evince race-based harassment and that the few racially related allegations resembled "political statements about race made in B.W.'s presence." Furthermore, the magistrate judge determined that the few racially related harassment allegations occurred too infrequently to meet the standard for a race-based harassment claim under Title VI. The magistrate judge also concluded that B.W. had inadequately pleaded his Title VI retaliation claim because the Complaint did not allege that B.W.'s harassers were aware that he had filed grievances with either school. On February 15, 2022, the district court accepted and adopted the magistrate judge's report and recommendations. On appeal, B.W. only challenges the dismissal of his Title VI claims.

## II.

We review a district court's grant or denial of a motion to dismiss for failure to state a claim under Rule 12(b)(6) *de novo*. *Whitley v. BP, P.L.C.*, 838 F.3d 523, 526 (5th Cir. 2016). To survive such a motion, a complaint must allege enough facts, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, the complaint must include "factual allegations that when assumed to be true 'raise a right to

relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Conclusory statements or "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint pleading facts "that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Whether the plausibility standard has been met is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## A.

Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI "prohibits only intentional discrimination." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 407 (5th Cir. 2015) (emphasis omitted) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). A school district receiving federal funds may also be liable for student-on-student harassment under Title VI's deliberate indifference standard if:

> (1) the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school" (a racially hostile environment), and the district (2) had actual knowledge, (3) had "control over the harasser and the environment in which the harassment occurs," and (4) was deliberately indifferent.

*Id.* at 408 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644, 650 (1999)). Harassment "must be more than the sort of teasing and bullying that generally takes place in schools." *Id.* at 409 (quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011)); *see also Davis*, 526 U.S. at 651–52 ("Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender.").

We first observe that the bulk of the Complaint's allegations do not mention B.W.'s race at all. And the few that do are not "so severe, pervasive, and objectively offensive that [they] can be said to [have] deprive[d] [B.W.] of access to educational opportunities or benefits provided by [his] school[s]." *See Fennell*, 804 F.3d at 408. Indeed, each of these few incidents occurred within a period spanning over two-and-a-half years and was perpetrated by a different actor. Of these incidents, only one is truly severe—where I.L. made it known that he had assaulted B.W. because he was white. But this alone is not enough to establish harassment, even when considered alongside the few, less severe, race-based allegations. Accordingly, taken together, these few, relatively mild, and isolated incidents do not meet the standard for race-based harassment.

Two cases from this circuit are illustrative of this point. In *Fennell v. Marion Independent School District*, three black sisters alleged that their school district was deliberately indifferent to a racially hostile educational environment. 804 F.3d at 402. The district court dismissed their case on summary judgment. *Id.* at 401–02. This court affirmed the judgment on appeal but held that, while there was no genuine dispute as to the school

district's deliberate indifference, the plaintiffs had raised a genuine dispute that a racially hostile environment existed. *Id.* at 409–10. Specifically, there were multiple instances of nooses being left for black students (or their parents) to find, which on one occasion was accompanied by a note that was filled with racial animus and epithets, *id.* at 402; frequent use of the n-word and other epithets were directed at black students, *id.* at 403–04; one of the plaintiffs was "admonished" for her hairstyle by the athletic director who referred to it offensively and required her to cut and redye her hair, *id.* at 404; one of the plaintiffs received a text from a white classmate of an animation of Ku Klux Klan members chasing former president Barack Obama, *id.* at 405; a teacher told one of the plaintiff's classes that "all black people [are] on welfare," *id.* at 405; and another plaintiff was told by her peers that "[b]lack girls [aren't] pretty enough to be cheerleaders" when she tried out for the cheerleading squad, *id.* at 406. The school district contended that the harassment was "too periodic and sporadic to constitute a racially hostile environment," but we disagreed. *Id.* at 409. First, we reasoned that "[t]here is no question . . . that repeatedly being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race is harassment far beyond normal schoolyard teasing and bullying." *Id.* (internal quotations omitted). Relatedly, we also determined that the incident where a noose was accompanied "by a vitriolic and epithet-laden note . . . underscore[d] the severe, pervasive, and objectively offensive nature of the harassment." *Id.* Second, although we recognized that racial epithets being directed at black students may have occurred more infrequently than on a biweekly basis, we were persuaded that the degree to which those remarks were offensive counseled finding that they amounted to racial hostility. *See id.* ("Furthermore, this court has held that racially offensive remarks made every few months over three years was sufficient to raise a genuine dispute of

whether a hostile environment exists under Title VII." (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006))).

In *Sewell v. Monroe City School Board*, 974 F.3d 577 (5th Cir. 2020), we revived Title VI and Title IX claims that had been dismissed in the district court. There, the plaintiff-student, Jaylon Sewell, had alleged that he had suffered harassment stemming from his wearing his hair in a hairstyle that purportedly violated the school board's dress code. *Id.* at 581–82. After Sewell was prohibited from attending the first day of school due to his hairstyle, the dean of students "ridiculed him every other day by calling him a thug and a fool," and at one point asked him if he "was gay with that mess in his head." *Id.* at 581 (internal quotations omitted). The dean also discouraged students from talking with Sewell and encouraged a female student to lie and accuse Sewell of sexual assault; the dean told Sewell that he "wouldn't be getting in so much trouble if his hair were not that color." *Id.* In reversing the case's dismissal, we reasoned that it was plausible that the dean's harassment of Sewell originated "from a discriminatory view that African American males should not have two-toned blonde hair." *Id.* at 584. We noted the many ways that the dean treated Sewell and other black male students differently from students who were not black males: only black males were sent to the dean's office on the first day of school for not complying with the dress code, only Sewell was penalized for not adhering to the dress code despite other non-black and non-male students' failure to comply as well, and the verbal abuse Sewell suffered could be directly tied to his race and sex. *Id.* We therefore held that Sewell's complaint had adequately pleaded that the alleged harassment was sufficiently severe, pervasive, and offensive to deprive him of an educational benefit. *Id.* at 585. Of particular import to us were the dean's ridiculing of Sewell every other day, his discouraging of other students from talking to Sewell, and his

encouraging of another student to "concoct an allegation that Sewell had sexually assaulted her." *Id.* at 585.

Here, B.W. does not allege that any epithets akin to those used in *Fennell* were directed at him. Nor does he point to a frequency of racially motivated verbal harassment like that in *Sewell*. Instead, he argues that the "totality" or "constellation of surrounding circumstances" makes his case. In raising this argument, he points to a string of inapposite Title VI and Title IX cases. All of these cases describe events that either occurred with greater frequency or were more serious than what B.W. alleges. *See Carmichael v. Galbraith*, 574 F. App'x 286, 290 (5th Cir. 2014) (per curiam) ("Depending on the evidence at trial or summary judgment, the series of incidents where Jon's underwear was forcibly removed could plausibly constitute numerous acts of objectively offensive touching. Such acts plausibly fall outside the list of simple insults, banter, teasing, shoving, pushing, and gender-specific conduct which are understandable . . . in the school setting and are not actionable under Title IX." (internal quotations and citation omitted)); *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 652 (D. Md. 2013) ("Plaintiffs' evidence supports the inference that Classmate subjected JD to a few instances of sex-charged conduct, including raunchy remarks, lewd gestures, self-exposure and, arguably, inappropriate touching."), *aff'd*, 605 F. App'x 159 (4th Cir. 2015); *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 448 (6th Cir. 2009) ("DP was repeatedly harassed over a number of years [more than 200 times in one school year]. . . . This pervasive harassment escalated to criminal sexual assault."), *abrogated on other grounds by Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960 (6th Cir. 2020).

Furthermore, the allegations that B.W. argues should be considered within the totality of the circumstances lie outside the scope of racial animus. For example, B.W. contends that "the use of a Klu [*sic*] Klux Klan *meme* and later being called a Nazi and racist over and over represents [*sic*] a type of

racial animus like no other." But this is just one of his many flawed attempts to conflate political with racial animus. B.W. argues that we may infer that the political animus he suffered had racial undertones as well. By his reasoning, an attack on a white person because of his conservative or Republican views is necessarily an attack on him because of his race. But the inferences required to come to this conclusion are unreasonable as membership in either group is not foreclosed to those who are not white. And the Complaint itself belies this reasoning as it alleges that D.K. "admitted . . . that he made the KKK meme about B.W. because D.K.'s father told him not be [*sic*] friends with anyone who was a Conservative." The Complaint is replete with examples demonstrating that most of the incidents B.W. experienced were due to his ideological beliefs. B.W. fails to connect this political animus to the racial animus that he must show for his Title VI claim. Therefore, this claim was appropriately dismissed.[1]

---

[1] B.W. references some of the incidents involving his teachers in arguing that he was subject to severe and pervasive harassment due to his race but cites no authority for the proposition that a cause of action exists under Title VI for teacher-on-student harassment. Indeed, B.W.'s claim is predicated on our holding in *Fennell* where we determined that a cause of action for student-on-student harassment may be brought under Title VI. 804 F.3d at 408–09. The bounds of our decision in *Fennell*, however, did not extend to claims for teacher-on-student harassment. B.W. has modeled his Title VI claim as one for harassment as opposed to one for intentional discrimination. And in his reply, for the first time B.W. argues that a cause of action for teacher-on-student harassment exists citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). In that case, the Supreme Court held that one may bring a deliberate indifference claim against a school district under Title IX for teacher-on-student harassment. *Id.* at 290, 292–93. In *Fennell*, we applied the Supreme Court's holding in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 646–47 (1999), that a school district may be liable for student-on-student harassment based a deliberate indifference theory under Title IX, to Title VI due to the similarities between both legislative schemes. *Fennell*, 804 F.3d at 408. It appears as if B.W. would have us extend the holding in *Gebser* to claims falling under Title VI as well by utilizing our reasoning in *Fennell*. While this argument is compelling, B.W. fails to raise it at all in his opening brief and devotes less than one sentence to it in his reply without any analysis. Therefore, we consider the argument forfeited and do not weigh

No. 22-50158

## B.

B.W. also challenges the district court's dismissal of his Title VI retaliation claim. As this circuit has done in recent decisions, we will assume without deciding that Title VI includes a claim for retaliation. *See Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 n.4 (5th Cir. 2020) ("Title IX encompasses retaliation claims. So we assume without deciding that Title VI does too." (citation omitted)); *Jones v. S. Univ.*, 834 F. App'x 919, 923 n.3 (5th Cir. 2020) ("We assume without deciding that Title VI encompasses a retaliation claim.") (per curiam); *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 238 (5th Cir. 2020) ("[a]ssuming, without deciding" that a Title VI retaliation claim "is available" for the purpose of ruling on its viability at the motion to dismiss stage) (per curiam). To successfully plead such a claim, a plaintiff must show "(1) that she engaged in a protected activity; (2) that the Defendants took a material action against her[;] and (3) that a causal connection existed between the protected activity and the adverse action." *Jones*, 834 F. App'x at 923 (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)); *see also Sewell*, 974 F.3d at 586 ("A retaliation plaintiff must show that the funding recipient or its representatives took an adverse action against him because he complained of discrimination. That typically means the funding recipient itself signed off on the adverse action." (citation omitted)).

"As in other civil rights contexts, to show protected activity, the plaintiff in a Title VI retaliation case need only . . . prove that he opposed an unlawful employment practice which he reasonably believed had occurred or

---

the incidents involving B.W.'s teachers in determining that his Title VI harassment claim is not well pleaded. *See Tharling v. City of Port Lavaca*, 329 F.3d 422, 430 (5th Cir. 2003) ("issues not raised in the opening brief are deemed waived"); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

was occurring." *Peters*, 327 F.3d at 320 (internal quotations omitted); *see also Bisong v. Univ. of Hous.*, 493 F. Supp. 2d 896, 911–12 (S.D. Tex. 2007) (applying same). In the educational context, it follows that the plaintiff must have been opposed to an unlawful educational practice. When describing the complaints to school administrators that B.W. raised in middle school, the Complaint provides scant detail as to their substance and only ever alleges that B.W. and his parents were concerned about diversity of thought and B.W. being harassed on account of his political ideology. The same can be said of most of the complaints B.W. filed in high school as well. Notably, the Complaint provides more detail regarding one particular grievance, the second formal grievance that B.W. filed. Specifically, the Complaint states that B.W. alleged violations of the First and Fourteenth Amendments and Title IX, but it omits any mention of Title VI. There are no other factual allegations that could otherwise support a reasonable inference that B.W. and his parents engaged in a protected activity, *i.e.*, that they complained to AISD that B.W. had been harassed on account of his race. Therefore, B.W. cannot satisfy the first prong of the test for a Title VI retaliation claim.

## III.

The bullying as alleged in this case is a cause for concern. But while we do not condone bullying in any form, Title VI does not support a claim for bullying generally. A plaintiff like B.W. must allege that he was harassed because of his race, color, or national origin. B.W. has failed to do so. Likewise, because he cannot show that he was engaged in a protected activity when reporting the alleged harassment to school administrators, B.W.'s retaliation claim cannot overcome a motion to dismiss. Therefore, for the foregoing reasons, the district court's dismissal of this action is AFFIRMED.